1   Trenton R. Kashima (No. 291405)
    **BRYSON HARRIS SUCIU & DeMAY PLLC**
2   19800 MacArthur Blvd., Ste. 270
    Irvine, CA 92612
3   Tel: (212) 946-9389
    tkashima@brysonpllc.com
4
    ***Attorney for Plaintiff and the Class***
5

6

7

8
                    **UNITED STATES DISTRICT COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10

11  HENRY HARDY, individually and on
    behalf of all others similarly situated,        Case No. 2:25-cv-10141
12

13              Plaintiff,

14          v.                                       **CLASS ACTION COMPLAINT**

15  WESTJET AIRLINES LTD., a
    Canadian limited company,
16

17              Defendant.                           **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Henry Hardy ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to his and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant WestJet Airlines Ltd. ("WestJet" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against WestJet for its failure to secure and safeguard the personally identifiable information ("PII") of Plaintiff and Class Members.

2.    WestJet is a Canadian limited liability company located in Calgary, Alberta, that operates as a commercial airline, providing domestic and international flights worldwide, including flights to Los Angeles International Airport ("LAX"). In the regular course of its business, WestJet is required to maintain reasonable and adequate security measures to secure, protect, and safeguard its customers' PII against unauthorized access and disclosure.

3.    On June 13, 2025, an unauthorized third party gained access to WestJet's network and accessed and obtained files containing PII of WestJet's customers (the "Data Breach").

4.    WestJet owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. WestJet breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect customers' PII from unauthorized access and disclosure. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on

1

Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their customers' data.

5.      WestJet required its customers to provide it with sensitive PII and failed to protect it. WestJet had an obligation to secure customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between WestJet and Plaintiff and Class Members.

6.      As a result of WestJet's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiff and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring WestJet to ensure that it implements and maintains reasonable data security practices

going forward.

## THE PARTIES

9.    Plaintiff Henry Hardy is a resident of the State of California, whose personal information was compromised in the Data Breach.

10.    Defendant WestJet is a Canadian limited company located in Calgary, Alberta, that conducts business throughout this District.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Specifically, Plaintiff Henry Hardy is a citizen of California.

12.    For purposes of the Class Action Fairness Act, Defendant WestJet is deemed to be a citizen of both the state in which it has its principal place of business and the state under whose laws it is organized, pursuant to 28 U.S.C. § 1332(d)(10). Here, WestJet's country of citizenship is Canada, and its place of business in the United States in Los Angeles, California.

13.    This Court has personal jurisdiction over the Defendant because the Defendant does business in this District and has sufficient minimum contacts in this District.

14.    Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant has sufficient minimum contacts in this District.

## COMMON FACTUAL ALLEGATIONS

15.    This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress

CLASS ACTION COMPLAINT

WestJet's willful and reckless violations of his privacy rights. Plaintiff and the other Class Members were customers who contracted with WestJet.

16. On June 13, 2025, an unauthorized third party accessed and obtained Plaintiff's and the Class Members' PII.

17. This action pertains to WestJet's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach.

18. WestJet disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of WestJet's failure to safeguard and protect their PII.

19. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, WestJet assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

20. Despite recognizing its duty to do so, WestJet failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

21. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on WestJet to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### 1. The Data Breach

22. According to a data breach notification ("Breach Notice") posted on WestJet's website, unauthorized access to its network systems occurred on June 13, 2025. During this period, an unauthorized third party accessed files from its computer network that contained PII on the WestJet network, including full names with dates of birth, Social Security numbers ("SSN"), mailing addresses, travel documents, such as passports or government IDs, requested accommodations, and WestJet RBC Mastercard, WestJet RBC World Elite Mastercard, or WestJet RBC

World Elite Mastercard information.

23.    The Breach Notice posted on WestJet's website did not specify detailed measures or actions taken by WestJet to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

### 2. The Data Breach was Preventable

24.    Had WestJet maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, WestJet could have safeguarded customer and customer data. WestJet's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

25.    WestJet was at all times fully aware of its obligation to protect customers' PII and the risks associated with failing to do so. WestJet knew that information of the type collected, maintained, and stored by WestJet is highly coveted and a frequent target of hackers.

26.    This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:



CLASS ACTION COMPLAINT

27.    By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

28.    Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

29.    When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

30.    In April 2023, NationsBenefits "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

31.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).
[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[3] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guide s/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.
[4] *Id.*

CLASS ACTION COMPLAINT

32.     In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing customer personal information."[5]

33.     In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

34.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

35.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay,

---

[5] *Id.*
[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[7] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites /default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

CLASS ACTION COMPLAINT

are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

36.     The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[11]

37.     Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name.

---

[8]  *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramifications-identity-theft-fraud-dark-web/.

[9] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[10]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[11]  *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

---

Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

38.    Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

39.    Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

40.    Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

41.    The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable

---

[12] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

CLASS ACTION COMPLAINT

information and Social Security numbers are worth more than 10 times on the black market."[14]

42.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit cards, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

43.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

44.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

45.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

46.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the

---

[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

47.    The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this highly sensitive information.

### 3.  *WestJet Failed to Comply with the Federal Trade Commission*

48.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

49.    In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business*," which established guidelines for fundamental data security principles for businesses.[18] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach

---

[16] *Id.*
[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business-0

CLASS ACTION COMPLAINT

as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

50.    Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[20]

51.    Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### 4. The Impact of Data Breach on Victims

52.    WestJet's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

53.    The PII exposed in the Data Breach is highly coveted and valuable on

---

[19] *Id.*
[20] FEDERAL TRADE COMMISSION, *supra* note 17.

underground markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

54.     Furthermore, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

55.     Given the confirmed exfiltration of customer PII from WestJet, many victims of the Data Breach have likely already experienced significant harm as a result, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

56.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;

CLASS ACTION COMPLAINT

- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[21]

57.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

58.    Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

59.    The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an

---

[21] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[22] *Id.*

independent form of harm.[23]

60.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

61.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

   a.    The unconsented disclosure of confidential information to a third party;

   b.    Unauthorized use of their PII without compensation;

   c.    Losing the value of the explicit and implicit promises of data security;

   d.    Losing the value of access to their PII permitted by WestJet without their permission;

   e.    Identity theft and fraud resulting from the theft of their PII;

   f.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

   g.    Anxiety, emotional distress, and loss of privacy;

   h.    The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

   i.    Unauthorized charges and loss of use of and access to their

---

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

62.    Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

63.    Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[25]

64.    Plaintiff and Class Members have a direct interest in WestJet's promises and duties to protect PII, i.e., that WestJet would ***not increase*** their risk of identity

---

[24] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.
[25] Richard Turner, *Beyond the Bottom Line:   The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

CLASS ACTION COMPLAINT

theft and fraud. Because WestJet failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by WestJet's wrongful conduct. Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have occupied but for WestJet's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

65.     Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through WestJet's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

66.     Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as WestJet continues to hold their PII.

1

2

## CLASS ACTION ALLEGATIONS

3

67.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff

4

brings this action on behalf of himself and the following proposed nationwide class

5

(herein "the Class"), defined as follows:

6

**Nationwide Class**
All persons residing in the United States whose personally identifiable
information was accessed by and disclosed in the Data Breach to
unauthorized persons, including all who were sent a notice of the Data
Breach.

7

8

9

**California Subclass**
All members of the Nationwide Class who resided in California as of
June 13, 2025.

10

11

68.    Excluded from the proposed Nationwide Class the California Subclass are

12

any officer or director of WestJet; any officer or director of any affiliate, parent, or

13

subsidiary of WestJet; anyone employed by counsel in this action; and any judge to

14

whom this case is assigned, his or her spouse, and members of the judge's staff.

15

69.    **Numerosity:** Proposed Nationwide Class and the California Subclass

16

are likely to number in the tens of thousands and are thus too numerous to practically

17

join in a single action. Membership in the Class is readily ascertainable from

18

WestJet's own records.

19

70.    **Commonality:** Common questions of law and fact exist as to the

20

proposed Nationwide Class and the California Subclass and predominate over

21

questions affecting only individual Class Members. These common questions

22

include:

23

a.    Whether WestJet engaged in the wrongful conduct alleged
herein;

24

25

b.    Whether WestJet's inadequate data security measures was a
cause of the Data Breach;

26

c.    Whether WestJet owed a legal duty to Plaintiff and the other
Class Members to exercise due care in collecting, storing, and
safeguarding their PII;

27

28

d.   Whether WestJet negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e.   Whether Plaintiff and the proposed Nationwide Class and the California Subclass are at an increased risk for identity theft because of the Data Breach;

f.   Whether WestJet failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII;

g.   Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

71.    WestJet engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, both in quantity and quality, to the numerous questions that dominate this action.

72.    **Typicality:** Plaintiff's claims are typical of the claims of the Members of the proposed Nationwide Class and the California Subclass. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. WestJet's misconduct affected all Class Members in the same manner.

73.    **Adequacy of Representation:** Plaintiff is an adequate representative of the proposed Nationwide Class and the California Subclass because his interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the proposed Nationwide Class and the California Subclass will be fairly and adequately protected by Plaintiff and his counsel.

74.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are

likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against WestJet, making it impracticable for Class Members to individually seek redress for WestJet's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class)**

75.    Plaintiff realleges paragraphs 1 through 74 as if fully set forth herein.

76.    Plaintiff brings this claim individually and on behalf of the Nationwide Class.

77.    WestJet owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII in WestJet's possession was adequately secured and protected.

78.    WestJet owed, and continues to owe, a duty to Plaintiff and the other Class Members to safeguard and protect their PII.

79.    WestJet breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII.

80.   It was reasonably foreseeable that WestJet's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

81.   As a direct result of WestJet's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and the member of the Class's confidential information, Plaintiff and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

82.   By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access WestJet's systems containing the PII at issue, WestJet failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which WestJet has failed to do as discussed herein.

83.   WestJet's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

84.   Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

85.   WestJet's wrongful actions and/or inaction and the resulting Data Breach (as described above) constituted (and continue to constitute) negligence at common law.

86.   As a result of WestJet's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class Members have suffered and will suffer injury, including, but not

limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in WestJet's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

87.     Plaintiff realleges paragraphs 1 through 74 as if fully set forth herein.

88.     Plaintiff brings this action on his behalf and on behalf of the Nationwide Class.

89.     Plaintiff and Class Members conferred a monetary benefit upon WestJet in the form of monies paid to WestJet for travel or related services, with an implicit understanding that WestJet would use some of these payments to protect the PII it collects, stores, and uses to provide travel services and customer support.

90.     WestJet accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. WestJet also benefited from the receipt of Plaintiff's and Class Members' PII, as this was used to facilitate billing and payment services and other aspects of WestJet's business.

91.     As a result of WestJet's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between its payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

CLASS ACTION COMPLAINT

92.    WestJet should not be permitted to retain the money belonging to Plaintiff and the Class Members because WestJet failed to adequately implement the data privacy and security procedures that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

93.    WestJet should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Nationwide Class)

94.    Plaintiff realleges paragraphs 1 through 74 as if fully set forth herein.

95.    Plaintiff brings this action on his own behalf and on behalf of the Nationwide Class.

96.    In light of the special relationship between Defendant WestJet and Plaintiff and Class Members, where Defendant became guardian of Plaintiff and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of the information stored by Defendant, including its location.

97.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its current and former customers and borrowers to keep their Private Information secure.

98.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and Class in a reasonable and practicable period of time, and as

CLASS ACTION COMPLAINT

required by California's notification statute.

### COUNT IV
### VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA)
### (Cal. Civ. Code. Sec. 1798.100, et seq.)
(on behalf of Plaintiff and the California subclass)

99.     Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

100.     Plaintiff brings this action on his behalf and on behalf of the California Subclass.

101.     At all relevant times, Defendant was a "business" as defined in Cal. Civ. Code § 1798.140(c), and Plaintiff and the California Subclass Members were "consumers" as defined in Cal. Civ. Code § 1798.140(g).

102.     The PII and/or PHI collected and stored by Defendant constitutes "personal information" as defined in Cal. Civ. Code. Sec. 1798.81.5, including but not limited to names and driver's license numbers.

103.     The CCPA, Cal. Civ. Code § 1798.150(a), provides a private right of action for any consumer whose nonencrypted or nonredacted personal information is subject to unauthorized access and exfiltration, theft, or disclosure as a result of a business's violation of its duty to implement and maintain reasonable security procedures and practices.

104.     Defendant failed to implement and maintain reasonable security practices and procedures appropriate for the personal information to protect it from unauthorized access, exfiltration, and disclosure, in violation of Cal. Civ. Code § 1798.150(a).

105.     As a direct and proximate result of Defendant's violations of the CCPA, the personal information of Plaintiff and the California Subclass Members was compromised in the Data Breach.

106.     Concurrently with the filing of this complaint, Plaintiff is serving

CLASS ACTION COMPLAINT

Defendant with the notice required by Cal. Civ. Code § 1798.150(b) and will amend this complaint to allege a claim for statutory damages when the 30-day notice period expires. Presently, Plaintiff seeks injunctive relief to ensure Defendant implements and maintains reasonable security procedures to protect the private information of the California Subclass Members.

**COUNT V**
**VIOLATION OF THE CALIFORNIA CUSTOMER RECORDS ACT**
**(Cal Civ. Code Sec. 1798.80, et seq.)**
(on behalf of Plaintiff and the California Subclass)

107.    Plaintiff realleges and incorporates paragraphs 1 through 74 as if fully set forth herein.

108.    Plaintiff brings this action on his own behalf and on behalf of the California Subclass.

109.    At all relevant times, Defendant was a "business" that owns or licenses computerized data that includes personal information, as defined by Cal. Civ. Code § 1798.81.5(d)(1). The Private Information at issue here includes "personal information" as defined in Cal. Civ. Code § 1798.80(e).

110.    The California Customer Records Act ("CRA") requires businesses to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect it from unauthorized access, destruction, use, modification, or disclosure. Cal. Civ. Code § 1798.81.5(b).

111.    Defendant failed to implement and maintain such reasonable security procedures and practices. As a result of Defendant's violation of § 1798.81.5, Plaintiff and the California Subclass Members' personal information was stolen by cybercriminals/hackers.

112.    The CRA requires that any business that maintains personal information that has been subject to a security breach must disclose the breach in the most expedient time possible and without unreasonable delay. Cal. Civ. Code §

1798.82(a). Defendant failed to disclose the Data Breach to Plaintiff and the California Subclass Members without unreasonable delay, waiting months after discovery of the Data Breach to begin notifying impacted individuals.

113.     As a direct and proximate result of Defendant's violations of the CRA, Plaintiff and the California Subclass Members have suffered damages as alleged herein and seek all remedies available under Cal. Civ. Code §§ 1798.84(b), including compensatory damages, injunctive relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Nationwide Class and the California Subclass proposed in this Petition, respectfully request that the Court enter judgment in their favor and against WestJet, as follows:

A.     Declaring that this action is a proper class action, certifying the Nationwide Class and the California Subclass as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Nationwide Class and the California Subclass;

B.     Awarding Plaintiff and the Nationwide Class and the California Subclass appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Nationwide Class and the California Subclass, seeks appropriate injunctive relief designed to prevent WestJet from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and the Nationwide Class and the California Subclass pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Nationwide Class and the California Subclass reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and the Nationwide Class and the California Subclass such other favorable relief as allowable under law.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims so triable.

Dated: October 22, 2025     **BRYSON HARRIS SUCIU & DeMAY PLLC**

_/s/ Trenton R. Kashima_

Trenton R Kashima (SBN 291405)
19800 MacArthur Blvd., Ste. 270
Irvine, CA 92612
Tel: (212) 946-9389
tkashima@brysonpllc.com

_Attorneys for Plaintiff and the Class_